IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

**CHARLESTON DIVISION**

IN RE:   MICHAEL GENE PARSONS;


MICHAEL GENE PARSONS, et al.,

              Petitioners,

v.                                                    CIVIL ACTION NO.   2:12-cv-05885

ROCCO S. FUCILLO, et al.,

              Respondents.


**MEMORANDUM OPINION AND ORDER**

Pending is a Petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. (ECF 1.)

For the reasons that follow, the Court **GRANTS** Respondents' motions to dismiss [ECF 7, 8],

**DECLINES TO ADOPT** the PF&R, **ABSTAINS** from ruling on the merits of the Petition, and

**DISMISSES** the Petition.

*I. INTRODUCTION*

As styled, the Petition is brought on behalf of Michael Gene Parsons "by his legal

guardians, Carol Ruth Parsons and William Lloyd Parsons." (ECF 1 at 1.)   In connection with the

state criminal proceeding from which this case arises, Petitioner was found incompetent to stand

trial and has been involuntarily committed in state inpatient mental health facilities since 2009.   In

October 2010, Carol and William Parsons, Petitioner's mother and brother, respectively, were

appointed Petitioner's legal guardians in a separate state court proceeding.

On September 26, 2012, this case was referred pursuant to 28 U.S.C. § 636(b)(1)(B) to Mary E. Stanley, United States Magistrate Court Judge, for submission to this Court of proposed findings of fact and recommendation for disposition ("PF&R").   On November 26, 2012, Respondent Rocco S. Fucillo, in his capacity as the Secretary of the West Virginia Department of Health and Human Resources and Respondent West Virginia Department of Health and Human Resources (hereinafter "Respondents" or "DHHR") filed motions to dismiss the Petition.   [ECF 7, 8.]   On December 19, 2012, Petitioner filed his response (styled as "Reply") to Respondent's motions to dismiss.   (ECF 11.)

On March 25, 2013, Magistrate Judge Stanley filed her PF&R which recommended the following findings: (1) that the Court deny Respondents' motions to dismiss for failure to exhaust state remedies; (2) that the Court find that West Virginia Code § 27-6A-3(h) "deprives the petitioner of equal protection under the Fourteenth Amendment to the Constitution of the United States and is unconstitutional as applied to him; and (3) that "the petitioner has been held an unreasonably long period of time, more than four years, in violation of his right to due process of law."  (ECF 26 at 14-15, 20, 21-22.)   Magistrate Judge Stanley recommends that the Court: (1) "[d]eclare that the continued confinement of the petitioner at [the state mental health facility] is in violation of his constitutional rights"; (2) "[o]rder the petitioner released from the Circuit Court's jurisdiction and from [the state mental health facility] on home confinement with electronic monitoring and no unsupervised access to children; (3) "[d]eclare that W. Va. Code § 27-6A-3(h) is unconstitutional as applied to persons who are intellectually disabled, incompetent to stand trial, and unlikely to attain competency"; and (4) "[s]uch other relief as may be appropriate."  (*Id.* at 22.)

## II. FACTUAL BACKGROUND

The petitioner, Michael Parsons, is a forty-five-year-old man who has been diagnosed by forensic psychiatrists with pedophilia, pervasive developmental disorder, and mild mental retardation.   Psychological testing indicates that Petitioner's IQ has ranged from 50 to 63, and that he has the intellectual and developmental capacity of an eight-year-old child.   He is a high school graduate with a third grade reading level.   He has resided with his mother, Carol Parsons, has never lived independently, and has never been employed.

### A.     *September 2008 First Degree Sexual Abuse Charge and Mental Incompetency Determination*

On September 29, 2008, Petitioner was charged by criminal complaint in Kanawha County, West Virginia magistrate court with first degree sexual abuse.  (ECF 24-23.)   The affidavit in support of the complaint stated that the police responded to a 911 call reporting a sexual assault that occurred at a residence in Nitro, West Virginia.   The victim was Petitioner's niece, a two-year-old girl.   Upon their arrival at the scene, the police spoke with the victim's father who reported that Petitioner had taken the victim to the bathroom, undressed her and himself, hugged her, fondled her vaginal area, and touched his penis on the outside of the child's vaginal area.   Petitioner confessed to the victim's father and later to the police, repeatedly apologized, and stated he would never do it again.

Petitioner was arrested and made his initial appearance before a magistrate.   Gail Michelson, an assistant public defender, was appointed to represent him.   Petitioner was released on $100,000 bond.   Following a preliminary hearing, the magistrate found probable cause and the case was bound over to circuit court.   Petitioner was released on bond with the condition that he remain on home confinement at his mother's residence and have no contact with the victim.

In late December 2008, Judge Louis H. "Duke" Bloom, a Circuit Court Judge of Kanawha County, West Virginia, granted Petitioner's motion for a psychiatric evaluation to determine whether Petitioner was competent to stand trial and for a determination whether he had the mental capacity to appreciate the wrongfulness of his conduct and the ability to conform his conduct to the requirements of the law.   Following Petitioner's psychiatric evaluation, the psychiatrist, Ralph S. Smith, Jr., M.D., diagnosed Petitioner with pervasive developmental disorder and mild mental retardation.   Dr. Smith noted that based on his conversation with Petitioner's mother, Petitioner likes to touch people inappropriately, especially children, and that Ms. Parsons' efforts to correct her son's behavior had been unsuccessful.   Dr. Smith opined that Petitioner was not competent to stand trial and that Petitioner was not capable of conforming his conduct to the requirements of the law.   (ECF 25-3.)

On February 10, 2009, Judge Bloom held a competency hearing.   (ECF 24-2.)   The prosecuting attorney, Fred Gigginbach, Ms. Michelson, and Petitioner appeared.   At the hearing, Dr. Smith's report was offered without objection into evidence.   The record reflects that Petitioner's brother, William Parsons, was in attendance.   While Petitioner's counsel did not object to Dr. Smith's report or opinions, she contended that Petitioner should not be committed to a mental health institution as required under West Virginia Code § 27-6A-3(h).   Ms. Michelson requested that the risk assessment required under the statute be performed "in a home environment where [Petitioner is] with his mother."   (*Id.* at 5.)   She stated that Petitioner's family is "very, very, very involved in his life."   (*Id.* at 4.)   Ms. Michelson emphasized that Petitioner had a mental disability as opposed to a mental illness.   She argued Petitioner could not "survive leaving the home environment" and that "his family is going to have a really hard time."   (*Id.* at 5–6.)

4

Judge Bloom stated that under the statute he lacked discretion to permit the risk assessment to be undertaken in the manner suggested by counsel.   Judge Bloom permitted Petitioner to remain on home confinement until a bed became available at the designated mental health facility.

By an order dated February 11, 2009, Judge Bloom memorialized the February 10, 2009, competency hearing and made specific findings:   (1) Petitioner was not competent to stand trial; (2) Petitioner was not substantially likely to attain competency; and (3) the charge against Petitioner involved an act of violence against a person.   The order stated that the court "maintains jurisdiction over [Petitioner] for twenty-five (25) years, the maximum possible sentence [Petitioner] would have received if he had been convicted of the charges [sic], or until [Petitioner] regains competency and the criminal charges [sic] reach resolution whichever is sooner."   (ECF 24-13.)   Judge Bloom's order stated that the end date for the maximum sentence was February 10, 2034.   (*Id.*)   The order committed Petitioner to William R. Sharpe hospital ("Sharpe"), which was the least restrictive available mental health facility, and ordered the medical director to submit annual reports to the Court regarding Petitioner's condition.

B.      *Petitioner's Involuntary Commitment to State Mental Health Facilities*

In March 2009, Petitioner was independently evaluated for risk of future dangerousness by Susan Choby, M.D., a forensic psychiatrist affiliated with West Virginia University. (ECF 20 at 145-147.)   Dr. Choby diagnosed Petitioner with pervasive developmental disorder and borderline intellectual functioning.   The purpose of the evaluation was "to offer information about [Petitioner's] progress through the conditional release program." (*Id.* at 147.)   The report stated that several risk factors were present including "male gender, low socioeconomic status, low intelligence, criminal charges, employment problems and poor insight."   (*Id.*)   Dr. Choby noted

that although Petitioner's behavior had stabilized during his placement at Sharpe hospital, Petitioner

> continues to demonstrate poor insight into his condition.  The period of time during which safe behavior has been demonstrated has been unreasonable in contrast to the nature of the crime charged; the passage of more time during which safe behaviors are exhibited is recommended.  Suggestions for addressing Mr. Parsons' limited insight included one-on-one counseling and education regarding appropriate boundaries.   Once this issue is addressed, then it would be appropriate to begin increasing Mr. Parson's [sic] level of autonomy within Sharpe Hospital and developing a community placement plan.

(*Id.*)

On May 1, 2009, Judge Bloom held a status hearing regarding Dr. Choby's risk evaluation. (ECF 24-3.)    Petitioner and members of the Sharpe hospital staff appeared by videoconference. Petitioner was represented by Justin Collin, one of Ms. Michelson's colleagues in the public defender's office.   The prosecuting attorney, Fred Gigginbach, and Carol and William Parsons were also in attendance.   Mr. Collin argued that most of the dangerousness risk factors identified in Dr. Choby's future dangerousness evaluation were "fairly generic" and related to Petitioner's "mental disability."   (*Id.* at 4.)   Mr. Collin argued that "the one truly concerned risk factor that's contained in this report is his poor insight."   (*Id.* at 5.)   Judge Bloom responded that he had read the report and was satisfied with its recommendations.   Judge Bloom, however, afforded Mr. Collin an opportunity to question the various representatives from Sharpe hospital who were present via the videoconference.   Because Dr. Choby was not present, Mr. Collin asked Steve Meyers, a physician's assistant, if Petitioner could receive treatment in a local outpatient facility. Mr. Meyers responded, "I think he really needs the structure of this facility right now.   I don't believe as an outpatient [sic] would work right now."   (*Id.* at 6–7.)    In response to Mr. Collin's question whether any alternative inpatient treatment facilities existed, Mr. Meyers replied that the

6

Mildred-Bateman Hospital in Huntington, West Virginia might be considered.   (*Id.*)   After Mr. Collins concluded his questions, he asked Judge Bloom if Petitioner's brother, William Parsons, could address the court.   Judge Bloom denied Mr. Collin's request.   Thereafter, William Parsons interjected and asked that he be permitted to question one of the Sharpe hospital witnesses.   Judge Bloom refused Mr. Parsons's request and advised him that he did not have any standing to participate in the proceedings.   Mr. Parsons persisted and asked Judge Bloom if Petitioner's "legal guardian" (presumably Petitioner's mother) could speak with Mr. Collin.   Judge Bloom responded, "[t]his is not a matter of legal guardianship, sir" and concluded the hearing.   (*Id.* at 8.)

By order entered on May 7, 2009, Judge Bloom memorialized the May 1, 2009, hearing and made the following findings:   (1) Petitioner remained not competent to stand trial; (2) the forensic report recommended continued placement; (3) Petitioner was not substantially likely to attain competency and that the charges against him involve an act of violence against a person; (4) Petitioner presents a danger to himself and others; (5) Petitioner would have been convicted of the offense of first degree sexual abuse but for the determination that he is not competent to stand trial; (5) the maximum sentence he would have received is five years; (6) the court maintains jurisdiction over Petitioner for five years[1], the maximum possible sentence Petitioner would have received if he had been convicted of the charges, or until Petitioner regains competency and the

---

[1]        In his February 11, 2009, order referenced *supra*, Judge Bloom found that the maximum sentence was twenty-five years.   Judge Bloom later stated at a hearing in February 2010, that this finding was erroneous. (ECF 24-5 at 3.)   Also, the record contains a December 29, 2009, letter from Judge Bloom's law clerk to Sharpe Hospital stating that the court's "end of jurisdiction date in this case" was December 16, 2013.   (ECF 17-1.)

        Under the West Virginia Code, a person guilty of first degree sexual abuse is subject to a term of imprisonment of one to five years.   W. Va. Code § 61-8B-7(b) (2006).   However, if the defendant is eighteen years or older and the victim is younger than twelve years, the penalty is a term of imprisonment of "not less than five nor more than twenty-five years. . . ."   W. Va. Code § 61-8B-7(c) (2006).   It is unclear to the Court why this enhanced sentencing provision does not apply in this case and why Judge Bloom altered his end-of-jurisdiction date.

criminal charges reach resolution, whichever was sooner; and (7) the end date of the maximum sentence is December 23, 2013, plus an additional ten days, as provided by statute, to permit the institution of civil commitment proceedings.   The order directed Petitioner to be returned to the Sharpe hospital and directed that the medical director submit annual summary reports of Petitioner's condition to the court.   (*Id.*)

On June 4, 2009, D. Randall Clarke, a Charleston, West Virginia attorney retained by Petitioner's family, filed on Petitioner's behalf a "Motion for Correction or Reduction of Sentence" pursuant to West Virginia Rule of Criminal Procedure 35.[2]   (ECF 19 at 283–89, ECF 24-4 at 5.)   The motion states that Mr. Clarke hired Timothy Saar, Ph.D. to conduct a dangerousness evaluation of Petitioner at the Sharpe hospital, and that Dr. Saar's testing placed Petitioner in "the low to moderately low range of risk."   (*Id.*)   Dr. Saar opined that Petitioner functioned on the level of about an eight-to-ten year old child, that the Sharpe hospital was not an appropriate placement for Petitioner because of he was being housed with persons "with dissimilar mental disabilities" and because Petitioner did not appear to be receiving any benefit from the Sharpe hospital, and that Petitioner should reside with his mother on home confinement with electronic monitoring.

On July 24, 2009, a second independent dangerousness evaluation was conducted at the request of Petitioner's family, this time by Cheryl Hill, M.D., another psychiatrist affiliated with West Virginia University.   (ECF 25-5, ECF 20 at 53.)    Dr. Hill diagnosed Petitioner with "pervasive developmental disorder, not otherwise specified" and "borderline intellectual functioning."   (*Id.*)   Dr. Hill concluded that Petitioner exhibited the following dangerousness

---

[2]   Despite Mr. Clarke's representation of Petitioner, for reasons that are not clear, the public defender's office remained involved in the case.

risk factors: (1) male gender; (2) low socioeconomic status; (3) low intelligence; (4) poorly educated; (5) criminal charges; and (6) lacks insight.   In support of these findings, Dr. Hill noted that Petitioner "has had difficulty adhering to unit rules particularly in regard to appropriate use and timing of his telephone calls," evidence that Petitioner engages in inappropriate physical behavior with his mother, and evidence that Petitioner's family tends to treat him like a child and Petitioner's behavior regresses when he is in their presence.   (*Id.* at 151.)     Dr. Hill further noted that Petitioner stated that on the day of the charged offense "the thought on my mind [was] to be nasty with the little girl."   (*Id.*)   Petitioner told Dr. Hill that he "didn't want to do it" and tried to "fight the thought off" but could not.   (*Id.*)   Petitioner was unable to state how he would control his behavior or deal with similar thoughts in the future, replying repeatedly that it "would never happen again."   (*Id.*)   Based on these findings, Dr. Hill concluded that Petitioner had "significant dangerous risk factors and the nature of his offense was sufficiently severe that I would not recommend discharge into the community."   (*Id.* at 151.)   Dr. Hill noted that both of Petitioner's diagnoses were lifelong conditions and that Petitioner "at no time" should have access to children. (*Id.*)

In mid-August 2009, Petitioner was transferred to the Mildred Mitchell-Bateman ("Bateman"), a state mental health facility in Huntington, West Virginia that was closer to Petitioner's mother's home.   (ECF 20 at 16.)

In December 2009, Georgette Bradstreet, Statewide Forensic Coordinator, West Virginia Department of Health and Human Resources ("DHHR"), wrote a letter to Judge Bloom inquiring about the end date of the court's jurisdiction over Petitioner.   Ms. Bradstreet's duties involve the oversight of all persons who have been involuntarily committed to state inpatient facilities due to

findings of legal incompetency.   (ECF 24-10 at 25.)   Ms. Bradstreet's query was precipitated by questions raised by William Parsons, and because of the Court's inconsistent orders regarding the discharge date.   (As noted *supra,* the court's February 11, 2009, order stated that the court's jurisdiction over Petitioner ended on February 10, 2034; in contrast, the May 7, 2009, order stated that the end date was December 23, 2013.)   In response to the court's directive, Petitioner's newly-retained lawyer, Mr. Clarke, and the state advised Judge Bloom through written correspondence that December 23, 2013, was the correct discharge date.   (ECF 19 at 272-73, 278.)   Thereafter, Judge Bloom's law clerk advised Ms. Bradstreet that December 23, 2013, was the correct end date of the court's jurisdiction over Petitioner.   In Mr. Clarke's December 2009 written correspondence to the court, Mr. Clarke also inquired about the status of his pending motion for correction or reduction of sentence.   He noted that the motion had been pending seven months and that his earlier request for a hearing had been denied.   He renewed his request for a hearing on the motion.

On January 28, 2010, Bobby Miller, M.D., Petitioner's treating psychiatrist at the Bateman facility, evaluated Petitioner, and prepared a six-month summary report concerning Petitioner's risk of future dangerousness.   (ECF 20 at 123.)   Dr. Miller diagnosed Petitioner with pedophilia and borderline intellectual functioning.   Dr. Miller opined that Petitioner remained mentally ill and at high risk to repeat a sexual offense, and, thus, remained a danger to others.

On February 9, 2010, Mr. Clarke moved to withdraw as counsel.   (ECF 19 at 275.)   In support of the motion, Mr. Clarke stated that he had "experienced extreme difficulties in communicating" with Petitioner's family and that the family's interference had "wholly impaired" Mr. Clarke's ability to adequately represent Petitioner's interests.   (*Id.* at 272.)

On February 24, 2010, the circuit court held a hearing regarding Petitioner's mental status and on Mr. Clarke's motion to withdraw and the motion for a reduction of sentence. (ECF 24-4 at 2.) Mr. Gigginbach, Ms. Michelson, Mr. Clarke, and an assistant attorney general all appeared as counsel at the hearing. Petitioner and Bateman staff members appeared by videoconference. Ms. Bradstreet, the state forensic coordinator, was also present. The court heard testimony from Dr. Saar, the psychologist who had been previously retained by Petitioner's family and who had concluded that Petitioner was in the low to low-to-moderate dangerousness range.[3] Dr. Saar opined that Petitioner's low intelligence was a reason why he had difficulty following rules at Bateman. He further stated that Petitioner "[m]ay benefit from a structured outpatient proceeding [sic], such as a group home. . . ." (Id. at 29.) Dr. Saar also discussed the possibility that Petitioner could live with his mother if he was monitored electronically, if an alarm system were installed in the home, if Petitioner's use of his bike and a car were prohibited, if no computers were permitted in the home, if no children were present, and if Petitioner participated in a program at Prestera, an outpatient mental health facility, that was tailored to individuals with mental retardation. These measures, in Dr. Saar's view, would be a "workable alternative to [Petitioner's] placement at Bateman" if Petitioner's family "was willing to fully cooperate." (Id. at 41-46.) Dr. Saar acknowledged that his opinion differed from that of Bobby Miller, M.D., the board-certified forensic psychiatrist who opined that Petitioner was a high risk of re-offending.

Petitioner's mother also testified. Ms. Parsons stated that she would comply with the court's directives if Petitioner were permitted to reside with her. Petitioner's brother, William

---

[3] On February 23, 2010, Dr. Saar prepared a report that appears to memorialize his prior evaluation of Petitioner nine months beforehand and further appears to have been prepared in anticipation of Dr. Saar's testimony before Judge Bloom at a status hearing scheduled for the next day. (ECF 20 at 132-135.)

Parsons, also testified. Mr. Parsons stated that Petitioner's family had one goal which was Petitioner's "safe return . . . to his home and family." (*Id.* at 57.) He stated that the family was very concerned about Petitioner's "physical and mental safety" in either of the state mental facilities. Mr. Parsons added that Petitioner "did act inappropriately to some extent but not in a way that is unreasonably abnormal for a child of six to eight years of age" and that Petitioner had been "very severely punished for his lack of judgment. . . ." (*Id.* at 58.) Mr. Parsons noted that he had a petition signed by nearly 200 members of the community stating that they did not consider Petitioner a threat. (*Id.* at 60.) Judge Bloom then continued the hearing two days so that the testimony of Dr. Bobby Miller could be presented. The court did not rule on Mr. Clarke's motion to withdraw.

On February 26, 2010, Judge Bloom reconvened the status hearing. (ECF 24-5.) Dr. Miller testified that, as a result of Petitioner's treatment at Bateman, Petitioner was now mentally competent. (*Id.* at 4.) Dr. Miller agreed with Ralph Smith's assessment that Petitioner was not criminally responsible for his conduct. Thereafter, some discussion between the prosecutor, Judge Bloom, and Mr. Clarke ensued about a possible "not-guilty-by reason-of-mental-illness-plea" in light of Dr. Miller's competency opinion. (*Id.* at 6.) Dr. Miller stated that: Petitioner's treatment at Bateman was for pedophilia; the treatment had been on an individual basis; Petitioner's mental intellect had been taken into consideration in the treatment plan; Petitioner had made progress and even disclosed that he had offended another victim when in his early adolescence; and had, in the years immediately preceding his charged offense, possessed child pornography. (*Id.* at 10, 21.) Dr. Miller stated that he knew of no other place where Petitioner could receive the treatment he was receiving at Bateman and within the calendar year

Petitioner could be "transitioned home" with individual outpatient counseling services.   (*Id.* at 12.)   Dr. Miller noted that, while Petitioner's mother and sister have been helpful, William Parson had caused difficulties which included threatening Dr. Miller's staff.   (*Id*. at 13.)   At the conclusion of the hearing, Mr. Clarke asked Judge Bloom to rule on his motion to withdraw as counsel.   (*Id.* at 23.)   Judge Bloom denied the motion, but noted that he was going to appoint Mr. Clarke as counsel since Mr. Clarke had not been paid for some time.   Judge Bloom further ordered that William Parsons have no contact with Mr. Clarke.

In the fall of 2010, Carol and William Parsons instituted proceedings seeking legal guardianship of Petitioner.   On October 8, 2010, Kanawha County, West Virginia Circuit Judge, Paul Zakaib, Jr., entered an order appointing Petitioner's mother, Carol Parsons, and his brother, Will Parsons, guardians of Petitioner.   (ECF 20 at 20-23.)

On November 12, 2010, Judge Bloom conducted another status hearing.   (ECF 24-6.) Mr. Gigginbach, Mr. Clarke, Ms. Michelson, Carol Parsons, and Dana Eddy, another lawyer associated with Petitioner's family, attended the hearing.   Petitioner and Bateman staff members attended via videoconference.   At the beginning of the hearing, Judge Bloom vacated Mr. Clarke's court appointment and ordered that the public defender's office resume representation of Petitioner.   Dr. Bobby Miller testified.   Dr. Miller stated that he, in conjunction with Petitioner's family, had devised a transition plan that would permit Petitioner to return to his mother's home.   He noted, however, that the day before he had experienced further difficulties with Petitioner's family.   Petitioner's mother recently advised Dr. Miller that she disagreed with the pedophilia diagnosis.   Dr.  Miller stated that Ms. Parsons told him "[w]e just think he likes children because of the way he is, meaning friendly and/or mentally retarded.   It was a one-time

situation.   In my opinion, the case should have been dismissed."   (*Id.* at 10.)   Dr. Miller stated that he had concerns "over the attitudes of the family who would be given the primary responsibility for executing [Petitioner's transition] plan."   (*Id.*)   Dr. Miller stated that Ms. Parsons "does not believe that her son has a sexual disorder, committed a sexual offense[,] or is likely to do so in the future."   (*Id.* at 13.)   Dr. Miller further testified that Petitioner qualified for release in July or August 2011 to a group home facility.   In favoring the group home transition plan over return to Petitioner's mother's home, Dr. Miller stated, "This is a person who at this point still presents a risk to the community, which I think can be managed but I think it can only be managed by individuals who can recognize the risk."   (*Id.* at 14.)   Ms. Parsons addressed the court and urged it to consider the transition plan to her home.   In rejecting a transition plan to Ms. Parsons's home,   Judge Bloom stated such a treatment plan was "totally unacceptable, and it does not in my opinion offer any independent verification to the public as to the protection of the public."   (*Id.* at 16.)   Judge Bloom, responding to Ms. Michelson, ordered Dr. Miller to keep the public defender advised if an opening in a group home became available earlier than July and August 2011.   (*Id.* at 24-25.)   At no time during this hearing did the court re-visit the question of Petitioner's mental competence.   The court entered an order on November 16, 2010, memorializing the November 12, 2010, hearing

On February 8 and 22, 2011, Petitioner was again evaluated by Dr. Miller.   Dr. Miller opined that Petitioner's "dangerousness to himself and others has been sufficiently reduced so that he can be transitioned to a less restrictive level of care in the form of a Forensic Group Home." (ECF 20 at 175.)   Dr. Miller noted that Petitioner was on a waiting list for a group home and could be transitioned when an opening occurs.   (*Id.*)

14

On March 18, 2011, Judge Bloom convened another status hearing. (ECF 24-7.)   Judge Bloom had previously received correspondence from Ms. Bradstreet concerning William Parsons's alleged continuing harassment of the staff at Bateman.   Petitioner appeared by videoconference and was represented by Ms. Michelson.   Dr. Miller and other representatives from Bateman appeared by videoconference.   Mr. Gigginbach and a member of the state attorney general's office attended.   Ms. Parsons was present.   Judge Bloom addressed several matters. First, Judge Bloom noted Ms. Parsons and William Parsons's recent guardianship.   Judge Bloom, addressing Ms. Parsons, stated:

> This is not a civil commitment.   This is a commitment by Court order relative to a criminal case, and I don't expect the guardians to have any special status.   They are not to interfere with nor impede nor aggravate the staff at any facility at which [Petitioner] might be placed.
>
> If they have issues they want to take up, they can retain counsel and file a petition in this matter for me to review, but I don't expect there to be any hindrance in the treatment program.   You are delaying his recovering being transferred, according to this [Dr. Miller's] report, to a less restrictive environment.
>
> . . . . .
>
> It's William Parsons who appears to be interfering with the treatment and having conversations with [Petitioner] and discouraging him from participating and doing whatever he's supposed to be doing.   And that's not going to be tolerated.   Do you understand?

(ECF 24-7 at 5−6.)   In response, Ms. Parsons stated that she understood Judge Bloom, but she denied that William Parsons had acted in the manner Judge Bloom described.   Petitioner also defended his brother stating, "William Parsons is only trying to help me." (*Id.* at 7.)   Judge Bloom advised Petitioner that the Bateman medical staff took a different view of William Parsons's conduct.   Judge Bloom ordered that William Parsons have no contact with Petitioner "until such

time as I further allow it." (*Id.*)   The court entered its order regarding this hearing on March 18, 2011.

On August 31, 2011, Dr. Miller wrote Ms. Michelson a letter advising her of Petitioner's progress in treatment at Bateman. (ECF 20 at 94.)   Dr. Miller wrote that, although he had previously opined that Petitioner had attained the maximum benefit from his treatment, Petitioner's behavior was deteriorating and he was becoming "more aggressive when he doesn't get his way." (*Id.*)   Dr. Miller further stated that Petitioner's regression

> appears to be directly linked to interference from [Petitioner's] family. (*Id.*)
> They continue to encourage him to question staff's instructions, and by sharing
> with [Petitioner] their concerns about his treatment lead him to focus more on staff
> members' actions and what he perceives as wrongs against him instead of assisting
> him with correcting his problematic behaviors.

(*Id.*)

On September 11, 2011, Ms. Michelson filed a "Motion to Expedite Home Placement." (ECF 17-1 at 209.)    In support of the motion, Petitioner alleged, among other things, that he had been "physically assaulted by a [Bateman] health service worker." (*Id.*)   The motion further states that Petitioner's "co-guardian" also alleges that Petitioner had been physically assaulted and further alleges other instances of misconduct and negligence by the Bateman staff.   The motion requests that the court "immediately remove" Petitioner from Bateman and return him to his mother's home on home confinement.

On September 15, 2011, Judge Bloom conducted another hearing. (ECF 24-8.)   Mr. Gigginbach and Ms. Michelson appeared as counsel.   Petitioner appeared via videoconference.   Carol Parsons and Petitioner's sister, Jody Kisner, were also present in the courtroom.   Dr. Bobby Miller testified, reviewed Petitioner's treatment history, and relayed facts relating to

16

Petitioner's family's interference with Petitioner's treatment—conduct which included inappropriate "sexual and nonsexual behaviors." (*Id.* at 5.) Dr. Miller stated that a new treatment plan was developed after efforts to place Petitioner in a group home were unsuccessful. The new treatment plan involved individual therapy with Petitioner and educating him regarding pedophilia. The new plan also directly engaged Petitioner's family by bringing them into the process. Dr. Miller testified that the results had been positive. Dr. Miller testified (erroneously) that Petitioner's placement at Bateman was because Petitioner was "guilty by reason of mental illness."[4] (*Id.* at 24-6 at 9.) Dr. Miller recommended that Petitioner be placed on home confinement with electronic monitoring, that he continue with his medications, that his access to children and computers be restricted, that he continue counseling with Dr. Saar, and that he undergo counseling with a sexual offender counselor. (*Id.* at 5.) Dr. Miller stated that he expected that Petitioner could be returned home by Thanksgiving or Christmas. Contrary to his testimony in February 2010, Dr. Miller opined that Petitioner was not competent to stand trial and would not regain competency within the foreseeable future. (*Id.* at 7.) At the conclusion of the hearing, Judge Bloom directed the sheriff's office to initiate an investigation of the suitability of Ms. Parsons's home for Petitioner's possible release on home confinement. (*Id.* at 15.)

On September 21, 2011, Gail Michelson filed a motion to expedite Petitioner's transition from Bateman to his mother's care. (ECF 19 at 209–211.) The motion begins, "[i]n support of this motion defendant's co-guardian, Will Parsons, avers the following. . . ." (*Id.*) The following

---

[4]    Later in his testimony, however, Dr. Miller testified that the procedural framework he and the Bateman staff used was that provided by West Virginia Code Section 27-6A-5, which mandates periodic review of persons "found incompetent to stand trial." Towards the end of the hearing, following a colloquy between Dr. Miller and Judge Bloom, Judge Bloom clarified that any prior reference in the proceedings or court orders that Petitioner had been designated "not guilty by reason of mental illness" was an error and that Petitioner had not been convicted of any crime. (ECF 24-8 at 11.)

paragraphs detail allegations that Petitioner had been physically assaulted by a "health service worker" and "inmates in the hospital," that the Bateman staff had failed to treat a "severe foot fungus condition" that impeded Petitioner's ability to walk, that Bateman staff "routinely strip" Petitioner after his visitations with his family, and that Petitioner had lost twenty pounds due to emotional stress.

The September 22, 2011, order memorializing the September 15th hearing provided that the court would convene another hearing to review the treatment plan and Petitioner's transition into the community. The order further noted that any prior order indicating that Petitioner was "not guilty by reason of insanity" was amended to Petitioner being "not competent to stand trial."

On September 28, 2011, two plans addressing Petitioner's transition from Bateman were developed. The first was an "individual transition plan", which was submitted by Ms. Michelson to Judge Bloom. (ECF 20 at 71.) This plan was prepared by the "Justice Education and Research Associates" of Casper, Wyoming. In her cover letter to Judge Bloom, Ms. Michelson urged the court to adopt Petitioner's proposal, a plan which would provide for Petitioner's immediate return to his mother's home, rather than wait for Dr. Miller to draft a plan. The second plan, completed on September 28, 2011, and titled "Community Placement and Treatment Plan," was prepared (presumably) by Dr. Miller. (ECF 17-1 at 204-06.) This plan outlined the terms and conditions of Petitioner's transition from Bateman to Petitioner's mother's home.

On October 10, 2011, Gail Michelson filed a renewed motion to expedite home placement of Petitioner. (ECF 19 at 201.) This motion first stated that it was brought on behalf of Petitioner by counsel, Ms. Michelson. The motion, attributing a variety of averments to Petitioner's "co-guardian, Will Parsons," claimed that Petitioner was "verbally attacked by an

18

inmate" at Bateman, that the inmate threatened Petitioner's and Ms. Parsons's lives, and urged

Judge Bloom to "immediately remove" Petitioner from Bateman and allow him to reside with his

mother according to Dr. Miller's Community Placement and Treatment Plan.   (*Id.* at 202.)

The next day, on October 11, 2011, Dr. Miller revised his "Community Placement and

Treatment Plan."   (ECF 20 at 184-87.)   This revised plan placed the following additional

restrictions on Petitioner: that the electronic monitoring of Petitioner be conducted with a GPS

device; that Petitioner would be prohibited from leaving the residence except for treatment by Dr.

Saar and Petitioner's sexual offender counselor or for medical emergencies; that Petitioner

**"NEVER** be in the presence of any children/adolescents under the age of 18 while in the home,"

and that Petitioner be monitored "within eye sight" anytime he was outside of the home including

the yard of the home.   (*Id.* at 184-85.)

On November 8, 2011, board-certified psychiatrist, Natalie Wallace, forensically

evaluated Petitioner for risk of future dangerousness.   (ECF 20 at 191.)   Dr. Wallace opined that

Petitioner met the criteria for a pedophilia diagnosis based in part on Petitioner's admission that he

had sexual urges towards young prepubescent girls as young as two years of age, and the fact that

police records indicated that prior to the charged offense involving his two-year-old niece,

Petitioner had a sexual encounter with a ten-year-old girl.   Dr. Wallace also diagnosed Petitioner

with mild mental retardation with a full-scale IQ range of 50–63, but was a high school graduate

with a third-grade reading level.   Dr. Wallace noted that Petitioner failed to abide by Bateman

staff instructions if not closely monitored, Petitioner had inappropriately touched a Bateman

patient, and Petitioner made sexually inappropriate comment to female staff members of Bateman

despite the fact that Petitioner was on a hormonal therapy regime.   Dr. Wallace concluded that

Petitioner had multiple future dangerousness risk factors including "a diagnosis of pedophilia," "a history of sexually inappropriate behaviors with children," "lack of insight into his inappropriate behavior on the unit," "limited insight into his inappropriate sexual behaviors," "impulsivity," and "a lack of appropriate family support."  (*Id.* at 195.)    Dr. Wallace further noted that members of Petitioner's family told the Bateman staff that "they do not believe that outpatient sex offender treatment or the avoidance of intoxicants in the home is necessary to Mr. Parsons's conditional release."  (*Id.* at 196.)    Dr. Wallace opined that Petitioner "would not receive adequate supervision if returned home at this time."  (*Id.*)  Dr. Wallace's findings and opinions were memorialized in a report dated November 21, 2011.

In late December 2011, Gail Michelson withdrew from any further representation of Petitioner.   Richard Holicker, another public defender, took over Petitioner's representation. (ECF 17-1 at 199.)

By letter dated December 21, 2011, Ms. Bradstreet advised Judge Bloom of Dr. Wallace's opinions.  (ECF 20 at 189−190.)    Ms. Michelson and the prosecuting attorney were copied on this letter.   Ms. Bradstreet advised Judge Bloom that Dr. Wallace and the state forensic review board were of the opinion that Petitioner remained "a significant risk of harm to others."  (*Id.*)  Ms. Bradstreet noted that the Parsons family had hired Donna Messerli, an individual alleged to have a bachelor's degree in criminal justice, to "negotiate [Petitioner's] release."   Ms. Bradstreet advised Judge Bloom that Ms. Messerli challenged Petitioner's pedophilia diagnosis notwithstanding the fact that "three other physicians have agreed to this diagnosis" of Petitioner. Ms. Bradstreet further stated that Petitioner's family "continues to display very poor insight into the real issue in that [Petitioner] is a diagnosed pedophile and that he poses a significant threat

20

especially to children if allowed to return home.   Instead they continue to be obstructive and intrusive toward Dr. Miller and [the Bateman] treatment team."   (*Id.* at 190.)

On January 4, 2012, Petitioner's new public defender, Richard Holicker, filed a motion seeking appointment of a guardian in the case or, alternatively, an order directing Petitioner's "putative Guardian, Will Parsons, not to interfere" with Petitioner's counsel in this case. (ECF 17-1 at 196-98.)   In support of the motion, Mr. Holicker claimed that Petitioner's former counsel, Ms. Michelson and Randall Clarke, had been forced to withdraw from their representation of Petitioner because of William Parsons's interference with their representation of Petitioner.   Also noted was the court's restraining order prohibiting William Parsons from interfering with Dr. Miller and his staff.   By order dated January 6, 2012, Judge Bloom concluded that he did not have jurisdiction to substitute a new guardian because he was not the judge who appointed William Parsons a guardian.   (ECF 17-1 at 194.)    The order, however, prohibited William Parsons from contacting or interfering with Mr. Holicker.

In early February 2012, Dr. Miller prepared a twelve-month summary report for Judge Bloom detailing Petitioner's health status, his progress in treatment, and the current treatment plan.   (ECF 20 at 202–205.)    Dr. Miller stated that Petitioner had reached maximum benefit from inpatient treatment.   Dr. Miller advised that his earlier recommendation and plan to return Petitioner to his mother's home was no longer viable because of Dr. Wallace's future dangerousness assessment, because of Petitioner's family's refusal to accept Petitioner's pedophile diagnosis, and because of the family's claims that Petitioner was being intentionally and persistently abused at Bateman.   Dr. Miller noted that the treatment team met with Petitioner's attorney, Mr. Holicker, and Petitioner's family.   Dana Eddy accompanied the family and claimed

21

to represent the family.   Mr. Eddy, however, was not permitted to attend the meeting.   The treatment team concluded that Petitioner would be transitioned to a forensic group home as soon as space became available.

On February 29, 2012, Mr. Holicker filed a motion for an order of prohibiting "any member of Petitioner's family from interfering with his treatment."  (ECF 17-1 at 171.)   The motion asserts that Petitioner had been interviewed by several different placement facilities, but all had rejected Petitioner based on Petitioner's family's interference with his treatment.   Mr. Holicker further stated that: Ms. Parsons told him that the pedophile diagnosis was incorrect and demanded the treatment team "prove it"; Ms. Parsons told Mr. Holicker that the treatment team "was conspiring to keep [Petitioner] hospitalized at [Bateman] for financial gain"; Petitioner's sister, Jody Kinser, allegedly verbally attacked the treatment team at a meeting in January 2012; the family brought an attorney to the meeting despite the fact that he was not counsel of record in the case; and that Ms. Kinser had initiated a Facebook campaign soliciting assistance from the Facebook community in trying to have Petitioner returned to his mother's home and included a photo of Petitioner with his arm around a young boy who is alleged to be Petitioner's cousin. Attached to the motion were Ms. Kinser's extensive Facebook postings which claimed, among many other things, that Petitioner was "falsely accused of sexual molestation of a minor" and "forced to endure torture at the hands of the court system and mental health facilities. . . ."  (*Id.* at 226.)   Ms. Kinser's postings detail various events and courtroom proceedings and disparage Mr. Holicker, the prosecuting attorney, Dr. Miller, and Judge Bloom.   Ms. Kinser asks Facebook members to "join our cause" and advises viewers that they "can donate money by sending money or checks" payable to "William Parsons." (*Id.* at 227–233, 245.)   Ms. Kinser provides William

22

Parsons's address in Tennessee.   Alternatively, Ms. Kinser provides a link that facilitates donations by credit card payments.    Ms. Kinser also urges sympathetic persons to write letters of protest to Bateman.

On March 8, 2012, Judge Bloom convened a hearing at which Mr. Gigginbach and Mr. Holicker appeared.  (ECF 24-9 at 2-22.)   Petitioner, Dr. Miller, and various Bateman staff appeared via videoconference.  Ms. Parsons and Ms. Kinser were present in the courtroom. Dana Eddy was not present.  Dr. Miller testified and re-affirmed his opinion that Petitioner remained not competent to stand trial.   He then proceeded to relay his findings and opinions as set forth in his February 2012 twelve-month summary report.   Dr. Wallace's future dangerousness report was made a part of the record.  Dr. Miller stated that he had referred Petitioner to three different group homes, all of which rejected Petitioner based on his unwillingness to follow the facilities' rules and Petitioner's family's lack of cooperation.   Dr. Miller stated that Petitioner's family's interference had worsened.   The family refused to accept Petitioner's pedophile diagnosis notwithstanding the fact that "five or six independent clinicians" had made that diagnosis.  Dr. Miller stated that William Parsons frequently telephones the Bateman hospital using a false name or claiming that he is a different family member.   William Parsons's most recent telephone call "included cursing out of a nursing supervisor."   Dr. Miller further stated that Donna Messerli from Justice Education Research Associates had sent him emails that "threatened the institution and threatened me personally if I don't either release [Petitioner] or suppress materials that would – for example, the dangers [sic] assessment that they claim are fraudulent." (*Id.* at 10.)   During the hearing Judge Bloom also considered Mr. Holicker's request that the West Virginia Department of Health and Human Resources replace Carol and Will Parsons as

Petitioner's legal guardian, but postponed any ruling on that question.   (*Id.* at 18- 20.)

On March 13, 2012, Judge Bloom entered an order that memorialized the March 8th hearing and memorialized his verbal order at that hearing that all members of Petitioner's family, and their representatives, were prohibited from contacting Petitioner and from encouraging others to contact him.   (ECF 24-20 at 3.)   The order further barred any contact between Petitioner's family and their surrogates and the Bateman staff except in the event of a medical emergency. The court, however, did permit Carol Parsons to have supervised telephone or in-person visitation with Petitioner once a week for thirty minutes.

On March 14, 2012, Mr. Holicker filed a motion seeking a rule to show cause why Petitioner's family members should not be held in contempt of the court's restraining order. (ECF 17-1 at 139-141.)   Attached to the motion were Ms. Kinser's extensive Facebook postings. (ECF 17-1 at 143-169.)

By letter dated March 15, 2012, Ms. Bradstreet advised Judge Bloom that since the March 8, 2012, hearing Petitioner has had "behavioral issues."[5]   (ECF 20 at 216-17.)   Ms. Bradstreet stated that Petitioner was reported to have "attacked several female staff members with both the phone receiver and his hands."   (*Id.*)   One staff member had "superficial scratches from the attack."   (*Id.*)   Ms. Bradstreet advised Judge Bloom that Petitioner's family has told Petitioner that the staff cannot tell him what to do, and Petitioner told the staff that his mother and brother have told him "over and over that he couldn't trust [the Bateman] staff."   (*Id.*)   Within a few hours following the March 8, 2012 hearing, Petitioner's father telephoned Bateman.   An aunt also called and demanded to speak with Petitioner.   An individual left a voicemail message at Bateman accusing Judge Bloom of child abuse for "taking away" Petitioner's phone privileges and that his

---

5   The letter is erroneously dated "March 15, 2011."

24

order was "an abuse of his power." (*Id.*)  Other people called on the patient phone.  These callers harassed other patients and demanded that they tell Petitioner to come to the phone.  Ms. Bradstreet advised Judge Bloom that Petitioner refused to go to the phone out of fear he would lose his visitation with his mother.  Finally, Ms. Bradstreet said that Carol Parsons was accompanied by Petitioner's father when she visited Petitioner on March 9, 2012.  Ms. Bradstreet requested guidance from the court.  The prosecuting attorney and Mr. Holicker were copied on this correspondence.

On March 23, 2012, the court conducted another hearing to address the matters raised in Ms. Bradstreet's March 15, 2012, letter. (ECF 24-10 at 2-43.)  Once again, the prosecuting attorney and Mr. Holicker appeared in person and Petitioner appeared by videoconference.  Mr. Holicker, Wendy Elswick (an assistant state attorney general), and Mr. Gigginbach appeared in person.  Dana Eddy appeared on behalf of Carol and Fred Parsons and Ms. Kinser, who were present in the courtroom.  William Parsons was also present.  Judge Bloom began the proceeding by instructing William Parsons to cease tape-recording the hearing.  Judge Bloom then asked Mr. Eddy if he intended to represent Petitioner.  Mr. Eddy replied that he and Petitioner's family had previously discussed the possibility that Mr. Eddy would take on Petitioner's representation in the criminal case, but that Mr. Eddy had a conflict of interest at the time of the discussions.  Mr. Eddy stated that his conflict has since "resolved."  (*Id.* at 6.)  Mr. Eddy added that he had intended to attend the March 8, 2012, hearing and file a notice of substitution of counsel, but was not able to do so because of a scheduling conflict.  Mr. Eddy stated that, now, in light of Mr. Holicker's pending motion seeking to hold Petitioner's family in contempt, "I then determined that it was probably ill advised to try to move to substitute as counsel. . . ." (*Id.* at 7.)  Mr. Eddy stated that he had

"withdrawn any intent to try to move to appear on behalf of Mr. Parsons, Michael Parsons."   (*Id.*)

Judge Bloom responded that he had not issued a rule to show cause and that the purpose of the

hearing was to address the issues raised in Ms. Bradstreet's recent correspondence.   Judge Bloom

re-stated his previously expressed view that Petitioner was the only person who had standing in the

case.   Judge Bloom further expressed his frustration that Petitioner's transition out of Bateman

would have likely occurred but for Petitioner's family's interference with Petitioner's treatment at

Bateman and their failure to comply with the court's orders.   Thereupon, Mr. Eddy interjected

that he thought "the statute is unconstitutional."   (Presumably, Mr. Eddy was referencing West

Virginia Code §§ 27-6A-2, -3, and -5.)    Mr. Eddy asked the court's permission "to appear in this

matter on behalf of the Parsons family. . . ."   (*Id.* at 12.)   Judge Bloom rejected Mr. Eddy's

request and reiterated his view that Petitioner's family had no standing in the case.   (*Id.* at 12.)

Mr. Eddy voiced his disagreement.   The following exchange between Judge Bloom and Mr. Eddy

occurred:

> Judge Bloom:     Now, I'll tell you what I will allow you to do.  I will allow you to
> monitor these proceedings.  That's not giving you party status, it's not giving you an
> opportunity necessarily, unless I decide to allow it, to question witnesses or to call
> witnesses, but it does allow you the opportunity to monitor; and I would allow you to, if
> you choose to do so, file advisory matters with the Court.

> Mr. Eddy:          Your Honor, that is the status I was seeking.

> . . . . .

> Judge Bloom:     But what I'm making clear is that I'm not granting status such as to
> allow any appeals of any of my decisions or actions in this court to allow party status to
> give your clients any rights.

> Mr. Eddy:          Understood, your Honor.

(*Id.* at 14-15.)

Shortly after the foregoing exchange, Petitioner advised the court that he wanted to fire Mr. Holicker.   After listening to both Petitioner and Mr. Holicker, Judge Bloom denied Petitioner's request.   Thereafter, Ms. Bradstreet testified about the matters contained in her March 15, 2012, letter to the court.    Judge Bloom instructed Ms. Bradstreet to conduct a treatment team meeting and include Mr. Eddy and the family and report back to the court within thirty days.[6]

By letter dated April 25, 2012, Ms. Bradstreet advised Judge Bloom that the treatment team met at Bateman the day before.   (ECF at 255-56.)   Dr. Miller advised the rest of the treatment team that Petitioner's behavior had improved and his therapy was continuing.   Ms. Bradstreet recommended to Judge Bloom that, although there had "been a few incidents with the family," they had been less problematic.   Ms. Bradstreet stated that Dr. Miller and the treatment team recommended that Petitioner's visitation with his mother be increased.

In June and July 2012, Ms. Bradstreet sent more letters to Judge Bloom.   (ECF 20 at 8-9, 10-12, 13-14,  269-72.)    In her June 6, 2012, letter Ms. Bradstreet stated that although there had been "some issues of family calling and interrogating other patients," this conduct was "manageable."  (*Id*. at 13.)  Petitioner's increased visitation with his mother had gone well. Ms. Bradstreet reported that Petitioner continued to struggle with anger and has "a very low ability to tolerate frustration."  (*Id.*)  Petitioner was verbally aggressive with female patients and tended to "target females who have a youthful appearance. . . ." (*Id.*)    The most recent incident occurred on June 2, 2012.   Notwithstanding these issues, Ms. Bradstreet stated that Petitioner was actively participating in treatment and making some progress.   Ms. Bradstreet stated that if Petitioner is able to maintain his behavior for thirty consecutive days without loss of privileges, he should be

---

6  The record does not contain a copy of the order from this hearing.

referred to a forensic group home.  By letter dated June 28, 2012, Ms. Bradstreet reported to

Judge Bloom that Petitioner had "attacked a staff person punching that person 5-6 times."  (ECF

20 at 10.)  Because of this incident Dr. Miller and the treatment team recommended that all plans

to transition Petitioner to a group home be suspended until such time as Petitioner could control his

behavior.  By letter dated July 20, 2012, Ms. Bradstreet advised Judge Bloom that on July 9,

2012, Petitioner burst into a room, "trapped and cornered a nurse against the door," and, with his

body less than an inch from the nurse's, screamed aggressively at the nurse.  (ECF 20 at 269.)

Dr. Miller formulated a new treatment plan for Petitioner that granted Petitioner increasing

privileges if he maintained good behavior.  Ms. Bradstreet advised Judge Bloom that Petitioner's

assault on staff "demonstrates that he remains a significant risk of harm to others."  (*Id.* at 270.)

Ms. Bradstreet stated that a group home referral was not appropriate and a referral would not be

made until Petitioner was able to control his behavior.  On July 24, 2012, Ms. Bradstreet sent

Judge Bloom an addendum to her July 20, 2012 letter and requested increased telephone privileges

for Petitioner.  On July 26, 2012, Judge Bloom entered an agreed order that permitted increased

privileges for Petitioner as outlined by Dr. Miller.  (ECF 24-21 at 1-4.)

On September 26, 2012, Petitioner filed the pending petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254 in the Southern District of West Virginia.  The petition states that it

is filed by Petitioner's "legal guardians, Carol Ruth Parsons and William Lloyd Parsons . . . ."

(ECF 1.)  Petitioner's counsel is Dana Eddy.  Attached to the petition are two affidavits by Carol

and William Parsons.  Both affidavits state, among other matters, that the affiants believe that

they are unable to address asserted violations of Petitioner's constitutional rights through the state

courts.  (Neither affidavit offers any explanation why Petitioner's legal guardians, who have been

represented by Mr. Eddy in some capacity since at least November 2010, failed to avail themselves of remedies available to them in the state courts.)  (*See* ECF 24-6 at 4-5.)

By letter dated October 3, 2012, Ms. Bradstreet again updated Judge Bloom.  (ECF 20 at 3-4.)  Ms. Bradstreet's report stated that Petitioner's progress was not going well.  Petitioner continued to violate rules and failed to "maintain appropriate boundaries with other patients, as well as staff."  (*Id.* at 3.)  Petitioner continued to show poor impulse control and had little insight into his issues with pedophilia.  Petitioner told the staff that his family told him not to talk with them and that when he leaves Bateman he will be permitted to be around children and no one would stop him.  In late September 2012, Petitioner grabbed a female staff member, became very agitated and verbally aggressive with her when he was told to stop.  A "psychiatric emergency was called."  (*Id.* at 3.)  Ms. Bradstreet stated that Petitioner refused to engage in treatment, apparently with his family's support.  Ms. Bradstreet stated that "in an effort to try and find a viable treatment option for continued treatment and to protect the public, a referral was made for an independent assessment and transition plan through West Virginia University."

On February 14, 2013, Judge Bloom held another status hearing.  (ECF 24-11.)  Once again, Mr. Gigginbach and Mr. Holicker appeared in person.  Petitioner and several Bateman staff appeared by videoconference. Carol and William Parsons and Ms. Kinser were in attendance. Mr. Eddy was not present.  Based on the sworn testimony of the Bateman witnesses, evidence was tendered that Petitioner continued to behave aggressively with Bateman staff, failed to comply with the hospital's rules, and that another group home had rejected Petitioner on account of Petitioner's behavior.  More specifically, Petitioner continued to invade the physical space of female patients and became angry with Bateman staff when they intervened.  In recent weeks,

Petitioner had thrown a telephoned across a room and "punched the nurse manager" of his unit. (*Id.* at 9.) Petitioner told the staff that they were being "mean" and "were just picking on him." (*Id.* at 9-10.) In her son's presence, Carol Parsons advised the Bateman staff that they would be sued and would be getting letters from her lawyer soon. Petitioner told the staff that he did not have to listen to what they say; he only had to listen to his mom and do what she says. (*Id.* at 12.) Petitioner's ability to transition to a less restrictive environment had been impeded in part to the family's interference and there was no possibility that Petitioner would be accepted into a group home so long as the family continued to interfere. (*Id.* at 14.) A Bateman witness testified that it would be helpful if Petitioner's family would cease discussing with Petitioner the pending federal case because Petitioner "get very fixated on that part of what they're doing rather than on the treatment." (*Id.* at 16.) Ms. Bradstreet also testified. (*Id.* at 17- 23.) Ms. Bradstreet stated that Petitioner denied hitting the nurse in a meeting, but later privately admitted to her that he did. Ms. Bradstreet also stated that, in addition to hitting the nurse, Petitioner had also hit a staff member with a clipboard and had "tried to jump across a desk to attack a nurse", all within the last month or so. (*Id.* at 19.) Following the testimony, Mr. Holicker expressed his frustration to Judge Bloom about his representation of Petitioner. Mr. Holicker stated:

> Your Honor, as you've heard, the family facilitated - - well, first let me say for the record and as an officer of the Court I am not the lawyer being referred to who is going to go after the hospital. The only other lawyer who is involved with Michael is Mr. Eddy who does not appear to have shown up today.

> Mr. Eddy previously indicated in this court that he couldn't represent Michael because he has a conflict, some sort of altercation between another client of Mr. Eddy's and Michael's, and yet he is representing Michael in this federal suit.

> One of two things is true: either Mr. Eddy has a conflict or he doesn't have a conflict. If he has a conflict, he probably shouldn't be representing Michael in the federal suit. If he doesn't have a conflict – and I don't know if he does or doesn't –

but if he doesn't have a conflict, he is facilitating the family to influence Michael to accept him as his lawyer.   Michael has made references to Mr. Eddy as his lawyer. Mr. Eddy's involvement has poisoned the relationship that I have with Michael.

If Mr. Eddy does not have a conflict, I would respectfully ask, since the family has retained him apparently, that Mr. Eddy represent Michael in this case, because I am tilting at windmills because of what I believe is the interference of Mr. Eddy representing the family and, by extension, Michael.

I'm not saying that I have a conflict in continuing to represent Michael, but what I am saying is that Mr. Eddy's having ingratiated himself into this case and into Michael's confidence has made it difficult, if not impossible, for me to have a good lawyer-client relationship with Michael, and that's an issue that I would like the Court to address.

(*Id.* at 23-25.)   Mr. Holicker also brought to the court's attention that the website titled "bringmichaelhome.com" solicited donations.   Thereafter, Judge Bloom stated "I assume that the family will make Mr. Eddy aware that if he wants to take on representation, that he should file an appropriate motion with the Court."  (*Id*. at 26.)   Thereafter, Carol Parsons addressed the court and denied that she advised Petitioner to disobey hospital rules or that she encouraged him not to cooperate with Bateman staff.   She stated she was always supportive of the staff, although she added that when Petitioner did have problems it always involved the same staff members. Carol Parsons agreed to Judge Bloom's suggestion that she participate in counseling with Petitioner and Bateman staff.   William Parsons expressed his frustration that the family was not able to interact with Petitioner except through letters.   Ms. Kinser stated that Petitioner did not have problems at Bateman during his first year and a half, but now his behavior was deteriorating. Petitioner expressed his desire to be able to see his family and asked if he would be able to go home on December 23, 2013.   Judge Bloom told Petitioner that December 23, 2013, would be the end of the court's jurisdiction but that whether Petitioner was released depended on the judgment of the

31

state.[7]

By letter dated April 30, 2013, Ms. Bradstreet once again updated Judge Bloom regarding Petitioner's status at Bateman.   (ECF 29-1.)   Ms. Bradstreet reported that while Petitioner was undergoing weekly family therapy with a psychologist and his mother and that his behavior had improved in several respects, he continues to be argumentative, refuses to takes directions, and, at times, is aggressive with the Bateman staff.   He is frequently verbally aggressive.   Ms. Bradstreet further advised that a sex offender forensic group home refused Petitioner's placement in that facility due to his aggression and his refusal to follow directions.   This correspondence is the most recent document contained in this Court's record.

The state criminal court proceeding is currently pending.

## III.    DISCUSSION

### A.    Section 2254

Petitioner has sought relief under 28 U.S.C. § 2254.   The Court must first decide whether § 2254 is an available means of redress under the facts of this case.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, a person in state custody pursuant to a state court judgment may seek to challenge his confinement under 28 U.S.C. § 2254.   Section 2254(a) provides:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

Section 2254 is not limited to cases involving convictions in criminal cases.   In *Duncan v. Walker,* the Supreme Court stated:

---

7    The record does not contain a copy of the order from this hearing.

> Incarceration pursuant to a state criminal conviction may be by far the most common and most familiar basis for satisfaction of the 'in custody' requirement in § 2254 cases.   But there are other types of state court judgments pursuant to which a person may be held in custody within the meaning of the federal habeas statute. For example, federal habeas corpus review may be available to challenge the legality of a state court order of civil commitment or a state court order of civil contempt.

533 U.S. 167, 176 (2001).   Thus, it appears that Petitioner—who, pursuant to West Virginia Code § 27-6A-3, is presently involuntarily committed to a West Virginia mental health facility—may pursue habeas relief under 28 U.S.C. § 2254.

Pursuant to Section 2254(b)(1), however, an application for a writ of habeas corpus shall not be granted unless: (1) it appears the applicant "has exhausted the remedies available in the courts of the State"; or (2) "there is an absence of available State corrective process"; or (3) "circumstances exist that render such process ineffective to protect the rights of the applicant." An application may be denied on the merits notwithstanding the applicant's failure to exhaust his state remedies.   28 U.S.C. § 2254(b)(2).    It is a petitioner's burden to demonstrate that he has exhausted his state judicial remedies. *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir.).   A state prisoner in custody pursuant to a state court judgment has one year to file a federal petition for habeas corpus relief, starting from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A).

Contrary to Magistrate Judge Stanley's finding and recommendation, the Court finds that Petitioner has failed to exhaust his remedies in state court.   Additionally, the Court cannot find that there is "an absence of available State corrective process" or that "circumstances exist that render such process ineffective to protect" Petitioner's rights.

As the factual history of this case makes clear, the prolonged state court proceedings are

33

fraught with problems and, possibly, error.  The voluminous record in this case demonstrates, however, that Petitioner could have sought relief in state court on several occasions over the past four-and-a-half years by an assortment of tools.   In fact, the record does not reflect any effort by Petitioner's counsel or by Petitioner's legal guardians to directly appeal a single order, or seek relief through extraordinary writs of mandamus or prohibition, or file a state habeas action. Despite years of escalating and unhelpful conflict, the record is curiously devoid of any effort by Petitioner's representatives to tap available state remedies.   Petitioner could have directly appealed Judge Bloom's February 11, 2009, order initially committing Petitioner to the Sharpe hospital under the collateral order doctrine.  *See Sell v. United States*, 539 U.S. 166, 176–77 (2003) (holding that a pretrial provisional commitment order in a criminal case that directed that the defendant be involuntarily medicated was an appealable collateral order because it conclusively determined a disputed question, resolved an issue of constitutional significance, and was effectively unreviewable on appeal from a final judgment); *see also United States v. Martinez-Haro,* 645 F.3d 1228, 1231–32 (10th Cir. 2011) (stating that district court's order granting government's motion for a second competency evaluation was immediately appealable); *United States v. Godinez-Ortiz*, 563 F.3d 1022, 1026–28 (9th Cir. 2009) (finding that the appellate court had collateral order jurisdiction over criminal defendant's interlocutory appeal of district court's involuntary commitment order); *United States v. Magassouba*, 544 F.3d 387, 399-402 (2d Cir. 2008) (applying *Sell* and holding that collateral order doctrine permitted interlocutory appeal of involuntary hospitalization for psychiatric treatment and involuntary medication); *United States v. Gold*, 790 F.2d 235, 237–39 (2d Cir. 1986) (finding involuntary commitment order immediately reviewable under collateral order doctrine); *United States v. Lapi*, 458 F.3d 555, 560–61 (7th Cir.

34

2006) (finding in a criminal case that district court's order scheduling a hearing to determine whether defendant posed a risk of future dangerousness was immediately reviewable under collateral order doctrine);   *United States v. Davis*, 93 F.3d 1286, 1289 (6th Cir. 1996) (stating an "order of commitment for psychiatric examination easily satisfies the requirements of the collateral order doctrine"); *United States v. Weissberger*, 951 F.2d 392, 396  (D.C. Cir. 1996) (stating that competency evaluation order is reviewable under collateral order doctrine).[8]

The collateral order doctrine also would permit Petitioner to have appealed each of the seven orders Judge Bloom subsequently entered that continued Petitioner's involuntary commitment, the most recent being the order memorializing the February 14, 2013, status hearing. The fact that Petitioner's former and current attorneys did not, either by choice or neglect, pursue such relief does not mean this avenue is currently unavailable.   Carol and William Parsons, as Petitioner's legal guardians, are legally charged to act in Petitioner's best interests.   If they believe that Petitioner's current attorney, Mr. Holicker, is not effectively representing Petitioner, they should immediately take steps to replace him.   There appears to be no reason why Dana Eddy, who appears to have been informally representing Petitioner behind the scenes for some time, cannot formally take on Petitioner's representation in the state case.

Additionally, there is no evidence that Petitioner, by his guardians, ever sought extraordinary relief.   One appellate avenue that has long been available to Petitioner (and

---

8  The Court's research did not reveal West Virginia case authority directly on point.  The Court is aware of no reason why the Supreme Court of Appeals of West Virginia in a case of first impression would not apply the collateral order doctrine in the same manner it has been applied in the federal courts since the West Virginia Supreme Court of Appeals' collateral order jurisprudence is informed by federal case law and applies the same three-part test.  *See, e.g.*, *James M.B. v. Carolyn M.*, 456 S.E.2d 16, n. 4 (W. Va. 1995) (noting that a collateral order is reviewable if the order (1) conclusively determines the disputed controversy; (2) resolves an important issue completely separate from the merits of the action; and (3) is effectively unreviewable on appeal from a final judgment and citing *Thompson v. Betts*, 754 F.2d 1243, 1246 (5th Cir. 1985)).

presumably is currently available to Petitioner) is filing a writ of prohibition pursuant to West Virginia Code § 53-1-1 in an original proceeding before the West Virginia Supreme Court of Appeals challenging the constitutionality of his confinement.  *See, e.g.*, *State ex rel. Riley v. Rudloff*, 575 S.E.2d 377, 381-82 (W. Va. 2003) (stating that a writ of prohibition, as opposed to a state habeas corpus or mandamus proceeding, was an appropriate means of seeking appellate relief by a pretrial detainee who challenged the constitutionality of a state statute [West Virginia Code § 27-5-2(a)] that prohibited applications for involuntary hospitalizations on behalf of incarcerated persons).[9]  For unknown reasons, Petitioner, by his guardians, has not pursued this remedy.

Finally, the involuntary commitment statute expressly provides that a person who is found not competent to stand trial may present a defense on the merits of the case to the circuit court judge.  Pursuant to West Virginia Code § 27-6A-6, Petitioner, if he believes there is insufficient evidence to sustain a conviction or if he believes dismissal of the case is otherwise merited, could

---

[9]      The record in this case is rife with disturbing evidence of bitter conflict between Petitioner's family and *each* of the several attorneys who have attempted to represent Petitioner over the past four-and-a-half years of this matter. Each of these attorneys—Gail Michelson, Randall Clarke, and Richard Holicker—appears to have struggled mightily with Petitioner's family, most particularly, William Parsons.  The record reveals that Mr. Eddy represented Petitioner's family—but not Petitioner—in connection with the pending state criminal proceeding for the past several years.  In fact, Mr. Eddy has attended several hearings and at one point challenged the constitutionality of the involuntary commitment statute, and further argued to Judge Bloom that Petitioner's mother and brother, as legal guardians, should have been given standing in the state criminal case.   It is apparent from the record that Petitioner's family retained Mr. Eddy in connection with the potential filing at some point of a damages suit.  Dana Eddy also appears to have been a source of much frustration to Petitioner's current public defender, Richard Holicker.   Based on Mr. Holicker's statements at the February 14, 2013, hearing, Mr. Eddy's alleged interference with Mr. Holicker's representation of Petitioner, if true, potentially implicates troubling professional ethical issues.

        To the extent that Petitioner's legal guardians, Carol and William Parsons, believe that Mr. Holicker is not effectively representing Petitioner in the state court criminal matter, they have been legally obligated for several years— and remain legally obligated today—to do something about it.   Clearly, the best interests of Petitioner would have been better served by other tactics.  Rather, than continue to interfere with Mr. Holicker's relationship with Petitioner, they would do well to seek to replace Mr. Holicker with Mr. Eddy or some other attorney.   While Mr. Eddy may have previously not been able to represent Petitioner in the state court criminal proceeding because of some potential or actual conflict-of-interest, it is obvious that any such conflict is no longer an impediment to his representation of Petitioner.

have—and still may—file a petition challenging the merits of the case.[10]   There is no evidence in the record before this Court that this was ever done.

B.      *Younger* Abstention

There is an additional, independent, related, and more compelling reason for dismissing this case.   In *Younger v. Harris*, the Supreme Court held that, absent extraordinary circumstances, a federal court should abstain from exercising jurisdiction and not interfere with a pending state criminal proceeding by awarding injunctive or declaratory relief.   *Younger v. Harris*, 401 U.S. 37, 41 & n. 2 (1971).   "The *Younger* doctrine, which counsels federal-court abstention when there is a pending state proceeding, reflects a strong policy against federal intervention in state judicial processes in the absence of great and immediate irreparable injury to the federal plaintiff." *Moore v. Sims*, 442 U.S. 415 (1979) (citing *Samuels v. Mackell*, 401 U.S. 66, 69 (1971)).   *Younger*, thus, implements the broader notion that ours

> is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Younger*, 401 U.S. at 44.

While the *Younger* policy was first announced in connection with a state criminal case, its abstention doctrine has been since applied to civil proceedings in which important state interests

---

[10]      The PF&R needlessly opines that there is insufficient evidence to support a conviction of Petitioner because the victim, now about age six, is not a competent witness and because any statements made by Petitioner to the police are inadmissible due to his inability to knowingly waive his *Miranda* rights.   The PF&R's commentary on these matters is, of course, mere speculation.   This commentary also ignores the fact that Petitioner's uncle, an eye-witness to at least part of the offense conduct, apparently walked into the bathroom and observed Petitioner and his (the uncle's) two-year-old daughter completely naked.   The child and Petitioner both made statements to the uncle that are likely admissible under one or more rules of evidence.   The Court need not and should not wade into such matters. These are issues better reserved for the state court to resolve.

are at issue. *Huffman v. Pursue, Ltd.*, 420 U.S. 592 (1975).   As articulated by the Fourth Circuit, "federal courts should abstain from the decision of constitutional challenges to state action, however meritorious the complaint may be, 'whenever [the] federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests.' " *Cinema Blue of Charlotte, Inc. v. Gilchrist,* 887 F.2d 49, 52 (4th Cir. 1989) (quoting *Hawai'i Hous. Auth. v. Midkiff,* 467 U.S. 229, 237–38 (1984).   Pursuant to *Younger* and its progeny, the Supreme Court generally has found abstention appropriate if the following three-pronged test has been met: 1) there are ongoing state judicial proceedings; 2) the proceedings implicate important state interests; and 3) there is an adequate opportunity to raise federal claims in the state proceedings.  *Martin Marietta Corp. v. Maryland Com'n on Human Rights* 38 F.3d 1392, 1396 (4th Cir. 1994) (citing *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982)).   These three prongs together are known as the *Martin Marietta* test.

When all three prongs of the *Martin Marietta* test are satisfied, a federal court may intervene in the state case "only where (1) 'there is a showing of bad faith or harassment by state officials responsible for the prosecution'; (2) 'the state law to be applied in the criminal proceeding is flagrantly and patently violative of express constitutional prohibitions'; or (3) 'other extraordinary circumstances' exist that present a threat of immediate and irreparable injury." *Nivens v. Gilchrist,* 444 F.3d 237, 241 (4th Cir. 2006) (quoting *Kugler v. Helfant,* 421 U.S. 117, 124 (1975)).

In the present case, all three prongs of the *Martin Marietta* test are met.   First, there is an on-going state judicial criminal proceeding pending.   Second, because the pending proceeding is criminal in nature and because Petitioner's claims seek to invalidate a state statutory scheme

38

authorizing the pre-trial, involuntary commitment of mentally ill[11] defendants, important state interests are necessarily implicated.   Third, as noted *supra*, it appears Petitioner has (and has had for some time) an adequate opportunity to raise federal claims in the state proceedings, that is, by direct appeal of a commitment order or by filing an original proceeding in the Supreme Court of Appeals of West Virginia seeking a writ of prohibition.

The Court can find no exception warranting intervention in the state case.   While the state court proceedings have been imperfect, there is no allegation of any bad faith or harassment by the prosecuting attorney's office.   Also, where Petitioner has been represented by counsel, has repeatedly been provided with an opportunity to be heard on a regular basis, has repeatedly been independently evaluated and repeatedly found to present a risk of future dangerousness, the Court cannot find that the applicable state law in this case is "flagrantly and patently violative of express constitutional prohibitions." *Younger*, 401 U.S. at 53–54.   Petitioner has failed to convince this Court that extraordinary circumstances exist that present a threat of immediate and irreparable injury justifying this Court's foray at this time into matters of such compelling interest to the State of West Virginia.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Respondents' motions to dismiss [ECF 7, 8], **DECLINES TO ADOPT** the PF&R, **ABSTAINS** from ruling on the merits of the Petition,

---

[11]   Throughout the record are references by Petitioner that he is merely mentally disabled and not mentally ill.   These statements are primarily rooted in the fact that Petitioner has an IQ that ranges from 50 to 63.   These statements ignore, however, the fact that Defendant has been diagnosed with two mental disorders, pedophilia and pervasive developmental disorder, not otherwise specified.   Petitioner's family disagreement with the pedophilia diagnosis does not change the fact that the diagnosis is a part of this record.

and **DISMISSES** the Petition.

   **IT IS SO ORDERED.**

   The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any

unrepresented party.

         ENTER:   July 9, 2013

      THOMAS E. JOHNSTON
      UNITED STATES DISTRICT JUDGE